# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DOUGLAS C. TERRY, an individual, WORLD BE FREE, LLC, and BODYGYM d/b/a<br><br>    Plaintiffs,<br><br>v.<br><br>ROBERT S. HINDS, an individual, LIFELINE INTERNATIONAL, INC., and LIFELINE USA,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:12-cv-00166-RJS<br><br>Judge Robert J. Shelby |

Plaintiff Douglas C. Terry is the founder and owner of Plaintiff World Be Free, which does business as BodyGym. Defendant Robert S. Hinds is the founder and president of Defendants Lifeline International and Lifeline USA (collectively Lifeline). BodyGym and Lifeline both market personal fitness exercise devices. In February 2013, Plaintiffs filed the operative Complaint in this action (Dkt. 76) alleging four causes of action arising from a Release and Settlement Agreement (RSA) entered into between Mr. Terry and Mr. Hinds in May 2007. Plaintiffs contend that:

1. Defendants breached the terms of the RSA by manufacturing, marketing, and selling the Lifeline Cable Bar product;

2. Defendants breached the covenant of good faith and fair dealing;

3. Plaintiffs are entitled to the entry of an order requiring Defendants to cease and desist from manufacturing, marketing, and selling the Lifeline Cable Bar. In addition,

Plaintiffs are entitled to the entry of an order that existing Lifeline Cable Bar products be seized and destroyed; and

4. Defendants engaged in unfair competition under the statutory and common law of the State of Utah, including at least Utah Code Ann. §§ 13-5a-101, *et seq.* (2011).

The parties filed cross motions seeking summary determinations on all four causes of action. (Dkt. Nos. 85, 89.) After careful consideration and for the reasons stated below, the court GRANTS IN PART and DENIES IN PART both Plaintiffs' and Defendants' motions for summary judgment.

## BACKGROUND

### I. Facts Preceding the Lawsuit

In 2005, Mr. Terry sued Mr. Hinds in a prior action involving a dispute unrelated to the one here presented. Mr. Terry and Mr. Hinds ultimately settled that dispute and in May 2007 entered into the RSA. (RSA, Exh. B, Dkt. 86-1; Third Amended Complaint at ¶13, Dkt. 76.)

In the RSA, Mr. Terry and Mr. Hinds agreed, in relevant part, to the following:

(1) Mr. Terry agreed to dismiss with prejudice all claims brought by him in that action against Mr. Hinds (RSA at ¶1);

(2) Mr. Hinds and Mr. Terry agreed to execute and be bound by the terms and conditions of a "Patent Assignment and License Agreement" (PALA) – which will be discussed in more detail below (RSA at ¶2);

(3) Mr. Hinds and Mr. Terry agreed to be named as co-inventors of U.S. Patent No. 6,988,978 (RSA at ¶3);

(4) Mr. Hinds and Mr. Terry agreed to be named as co-inventors of U.S. Patent No. 6,860,842 (RSA at ¶4);

(5)   Mr. Hinds and Mr. Terry agreed to be named as co-inventors of U.S. Patent

Application No. 10/602,928; and

(6)   Mr. Terry agreed to purchase certain products from Lifeline for a total amount of

$209,008 (RSA at ¶6).

Paragraph 10 of the RSA further provided that:

The parties understand and agree pursuant to the terms and conditions of the Patent and License Agreement attached hereto as Exhibit A and incorporated herein, by reference, that Hinds and Lifeline on the one hand and Terry on the other shall be marketing and selling products that are similar in appearance and function. To reduce that inherent risk of confusion which shall result from such similarity, Hinds and Lifeline agree that their product shall be marketing [*sic*] in the form similar to that as presently shown in Exhibit C, except that such product shall not be black in color and shall not contain on its surface any appliques, decals or other forms of illustrations or pictures depicting exercises, exercise positions, instructions or similar information, and said bar shall exclude a product that has ends that are designed to permit plugged cables to attach directly to the lifting bar or a package including slidable foot straps as shown in Exhibit D attached hereto. Said bar as shown in Exhibit C shall have ends that are designed to permit rigid handles to attach directly to the lifting bar . . . The parties expressly agree that the bar used by Terry shall be black or white in color and that Terry may affix to the bar by means of applique, decal or other means any illustrations, pictures, or similar depictions of exercises, exercise positions, instructions or similar information. Said bar as shown in Exhibit D excludes a product that has ends that are designed to permit rigid handles to attach directly to the lifting bar. Said bar as shown in Exhibit D has ends that are designed to permit plugged cables to attach directly to the lifting bar.

(RSA at ¶10.)

Exhibits C and D referenced in Paragraph 10 show a bar with a so-called "pipe bowl" design. This design has an opening shaped like a "pipe bowl" on either side of the bar where handles or plugged cables can be inserted.

## II.     Patent Assignment and License Agreement (PALA)

In accordance with Paragraphs 2 and 10 of the RSA, Mr. Terry and Mr. Hinds executed the PALA at around approximately the same time as they entered into the RSA. (Dkt. 85 at ¶16.) Under the PALA, Mr. Hinds assigned to Mr. Terry U.S. Patent No. 6,988,978 and U.S. Patent

Application No. 10/602,928.  (PALA at Exh. A, Dkt. 86-1.)  Mr. Terry licensed to Mr. Hinds U.S.

Patent No. 6,979,286.  (PALA at Exh. B.)  In addition, Mr. Terry also licensed back to Mr. Hinds

U.S. Patent No. 6,988,978 and U.S. Patent Application No. 10/602,928.  *Id.*

On one hand, Mr. Hinds agreed "to assign, convey, sell, grant and transfer to [Mr. Terry

the] rights, title and interest of every kind and character throughout the world, including moral

rights, in and to the Assigned Patents to the full extent of its ownership or interest therein."

(PALA  at ¶2.1.)  Mr. Hinds's assignment to Mr. Terry included

> all existing future domestic and foreign patent applications and registrations therefor (and
> all patents that issue therefrom and all divisions, continuations, continuations-in-part,
> reexaminations, substitutions, reissues, extensions, and renewals of such applications,
> registrations and patents, and the right to apply for any of the foregoing); all goodwill
> associated therewith; all rights to causes of action and remedies related thereto (including
> . . . the right to sue for past, present or future infringement, misappropriation or violation
> of rights related to the foregoing); and any and all other rights and interests arising out of,
> in connection with or in relation to the Assigned Patents.

(*Id.*)

On the other hand, Mr. Terry granted to Mr. Hinds "a worldwide, royalty-free, fully paid

up, non-exclusive, non-transferable license."  (PALA at ¶3.1.)  But, the parties agreed that "[t]he

License Grant . . . is limited to a field of use that excludes a product that has ends that are

designed to permit plugged cables to attach directly to the lifting bar and excludes a lifting bar,

or a portion of the lifting bar, manufactured in a black color."  (PALA at ¶3.2.)  In addition, under

the PALA, Mr. Hinds agreed to "limit its use of the Assigned Patents to make, use, sell, offer for

sale, and import products that excludes a product that has ends that are design[ed] to permit rigid

handles to attach directly to the lifting bar."  (*Id.* at ¶3.2.1.)

The PALA was specifically incorporated by reference into the RSA under Paragraphs 2

and 10.  By virtue of the incorporation by reference, the RSA and PALA represent a single

binding contract.

### III.    Lifeline Cable Bar

Plaintiffs allege that Defendants manufactured, marketed, and sold their Lifeline Cable Bar device in violation of Paragraph 10 of the RSA and Paragraph 3.2 of the PALA.  The Lifeline Cable Bar is a black personal exercise lifting bar that utilizes a weight resistant and pluggable elastic cord.  In addition, the elastic cord is attached to an opening on either side of the bar.  The openings on either side of the Lifeline Cable Bar are not shaped like a "pipe bowl."  Rather, the Lifeline Cable Bar has openings on either side of the bar shaped like a "figure 8."

On January 8, 2013, the U.S. Patent and Trademark Office issued a patent to the Defendants covering the "figure 8 apertures."  U.S. Patent No. 8,348,814.

### IV.    Reexamination

Mr. Terry filed this action in February 2012, alleging that Defendants directly infringed and continued to infringe at least one claim of the '286 and '461 patents – the '461 patent being a continuation of the '928 application.  (Complaint at ¶¶57-72, Dkt. 2.)  The '461 patent was obtained from patent applications filed by Mr. Hinds, assigned to Mr. Terry, and licensed back to Mr. Hinds as part of the RSA and PALA.  The '286 patent was licensed by Mr. Terry to Mr. Hinds under the PALA.

Shortly prior to the commencement of this action, Defendants sought reexamination in the USPTO of both of the '286 and '461 patents.  Defendants sought this reexamination because they correctly anticipated that Mr. Terry would assert claims that Defendants infringed the '286 and '461 patents.  As a result of the reexamination, all claims of the '461 were cancelled on September 25, 2012.  ('461 Reexam Certificate, Exh. D, Dkt. 86-4.)  In addition, all claims of the '286 patents were cancelled on March 26, 2013.  ('286 Reexam Certificate, Exh. C, Dkt. 86-3.)  The parties dispute whether Defendants were aware of the invalidating prior art references

submitted during reexamination when Defendants filed the initial patent applications that resulted in the issuance of '461 patent.

Plaintiffs assert that, as a result of the reexamination, they "paid in excess of $150,000 in attorney fees to prosecute and maintain these patents." (Terry Decl., Exh. K, Dkt. 86-11.)

## V. Damages

### A. Interrogatories

In October 2012, Plaintiffs responded to an interrogatory requesting that Plaintiffs "[i]temize all damages that Plaintiffs allege in the First Amended Complaint that they have suffered as a result of Defendants' alleged breach of contract." (Plfs.' Response to Defs.' First Set of Interrogatories at 6, Exh. E, Dkt. 100-5.) At that time, Plaintiffs stated that "[a]s this case is in its early stages and discovery is ongoing, Plaintiffs will seasonably supplement their response to this Interrogatory at the appropriate time." (*Id.*)

In December 2012, Plaintiffs supplemented their discovery responses and identified the following damages:

> Terry became aware in 2009 that Defendants were marketing and selling an exercise bar through at least SPRI Products, Inc., in violation of Mr. Terry's patent and contractual rights and as a result had to engage counsel to enforce said rights through at least a cease and desist letter and other negotiations. Plaintiffs are unaware of the volume of these sales. Following the execution of the May 1, 2007 Release and Settlement Agreement wherein Defendant Hinds, inter alia, assigned certain patents to Mr. Terry and agreed to correct inventorship in favor of Mr. Terry for certain patents, Defendant Hinds thereafter has attempted to invalidate said patents and/or related patents, including the patents asserted in this action, after using the validity of said patents as partial consideration to settle the 2005 lawsuit between Hinds, Terry, Lifeline International and others in violation of, inter alia, the covenant of good faith and fair dealing. As a result, Terry has incurred fees, including attorney fees, related to the prosecution and response to reexamination proceedings for patents which were transferred from Defendant Hinds and represented as valid and enforceable intellectual property. Plaintiffs have also incurred attorney fees in connection with bringing the present action and will seek an award for such under the asserted contracts and any applicable statute or common law. Also, as a result of Defendants' actions, as referenced in the First Amended Complaint, Terry's intellectual property has been damaged.

(Plfs.' Supp. Response to Defs.' First Set of Interrogatories at 8, Exh. F, Dkt. 100-6.)

**B.     Sales of the BodyGym and Lifeline Cable Bar**

In January 2009, Mr. Terry commenced a lawsuit against Greer Childers.  (*Terry v. Childers*, Case No. A579658-B, District Court, Clark County, Nevada.)  The lawsuit was based on a dispute regarding a Joint Venture between Mr. Terry and Ms. Childers whereby Mr. Terry and Ms. Childers agreed to work together to market the GymBar product and an improvement of the GymBar product called the BodyGym.  The lawsuit between Mr. Terry and Ms. Childers was dismissed with prejudice in July 2011.

Defendants allege that Mr. Terry did not aggressively go forward with the sales of the BodyGym product because of his dispute with Ms. Childers.  Specifically, Defendants allege that Mr. Terry rejected a proposed contract from the Home Shopping Network based on the dispute with Ms. Childers.  Moreover, Defendants argue that Mr. Terry did not implement a business or marketing plan in connection with the BodyGym.

In response to Defendants' allegation, Mr. Terry testified that he sold around 5,000 BodyGym units.  (Terry Dep. on Dec. 4, 2012 at 99:14-24; 101:2-11; 103:16-20, Exh. P, Dkt. 88-15.)  In addition, Plaintiffs argue they would have sold more units, but for the fact that Defendants inappropriately sold 7,777 units of the Lifeline Cable Bars in violation of the RSA and PALA.  (Inventory Sales History Report, Exh. B, Dkt. 103-2.)  Plaintiffs have requested that Defendants provide profit information for these sales of the Lifeline Cable Bar.  The Defendants objected to the request.  (Defs.' Response to Plfs.' First Set of Interrogatories, Exh. C and D, Dkt. 103-3.)

**ANALYSIS**

The parties filed cross motions seeking a summary determination as to [1] whether Defendants breached the terms of the RSA; [2] whether Defendants breached the covenant of good faith and fair dealing; [3] whether Plaintiffs are entitled to monetary damages and/or specific performance; and [4] whether Defendants engaged in unfair competition. The court first discusses the legal standard for summary judgment, and then analyzes the disputed issues in turn.

I.      **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A material fact is one that might affect the outcome of the suit under the governing law, and a genuine issue is one for which the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotations and citations omitted). In making this determination, the court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

II.     **Express Breach of Contract**

Plaintiffs contend that the language of the RSA and PALA is unambiguous and the Defendants breached the unambiguous and plain terms of the RSA and PALA by manufacturing, marketing, and selling the Lifeline Cable Bar. Defendants agree that the language of the RSA and PALA is unambiguous, but urge the court to conclude the opposite as a matter of law.

In resolving this dispute, the court will first apply Utah law in interpreting the terms of RSA and PALA. The court will then determine if either party is entitled to summary judgment under the terms of the RSA and PALA.

### A.      Interpretation of the RSA and PALA

In interpreting a contract, the court looks "to the writing itself to ascertain the parties' intentions, and [considers] each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1144 (Utah 2002). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* at 1145. But "if the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, extrinsic evidence must be looked to in order to determine the intentions of the parties." *Id.* "When ambiguity exists, the intent of the parties becomes a question of fact." *SME Industries, Inc. v. Thompson, Ventulett, Stainback and Assocs., Inc.*, 28 P.3d 669, 674 (Utah 2001).

Here, the court agrees with the parties that the contract is not ambiguous, and the court may determine the parties' intentions from the plain meaning of the contract. Specifically, the first sentence of Paragraph 10 of the RSA states that "[t]he parties understand and agree pursuant to the terms and conditions of the Patent and License Agreement attached hereto as Exhibit A and incorporated herein, by reference, that Hinds and Lifeline on the one hand and Terry on the other shall be marketing and selling products that are similar in appearance and function." It is clear the parties recognized that since Mr. Hinds assigned certain patents to Mr. Terry, and Mr. Terry

licensed these patents back to Mr. Hinds, Mr. Terry and Mr. Hinds would be manufacturing, marketing, and selling products that would be similar in appearance and function.

To distinguish Mr. Terry's products from Mr. Hinds's competing products, the RSA expressly limited the types of products that Mr. Hinds could manufacture, market, and sell. Paragraph 10 of the RSA states that "[t]o reduce that inherent risk of confusion which shall result from such similarity, Hinds and Lifeline agree that their product shall be marketed [*sic*] in the form similar to that as presently shown in Exhibit C, except that such product shall not be black in color and shall not contain on its surface any appliques, decals or other forms of illustrations or pictures depicting exercises, exercise positions, instructions or similar information, and said bar shall exclude a product that has ends that are designed to permit plugged cables to attach directly to the lifting bar or a package including slidable foot straps as shown in Exhibit D attached hereto."

Thus, under the RSA, if Mr. Hinds wanted to manufacture, market, and sell a product covered by the PALA, the product could not be black. Neither could the product contain on its surface any appliques, decals or other forms of illustrations or pictures depicting exercises, exercise positions, instructions or similar information. And, if Mr. Hinds wanted to manufacture, market, and sell a product covered by the PALA, the product could not have ends that were designed to permit plugged cables to attach directly to the lifting bar, nor could it utilize a package including slidable foot straps.

### B.       Express Breach of Contract Claims

Defendants argue the PALA and RSA contemplated only the delineation of the respective rights of Mr. Terry and Mr. Hinds as to bars with "pipe bowl" ends. So, under the PALA and RSA, Defendants argue that if Mr. Hinds made bars with "pipe bowl" ends, Mr. Hinds could not

make a "pipe bowl" bar that is black; Mr. Hinds could not make a "pipe bowl" bar that contains

on its surface any appliques, decals or other forms of illustrations or pictures depicting exercises,

exercise positions, instructions or similar information; and Mr. Hinds could not make a "pipe

bowl" bar that was designed to permit plugged cables to attach directly to the lifting bar or a

package including slidable foot straps.  But since Defendants' Lifeline Cable Bar has "figure 8"

ends, Defendants maintain it is neither contemplated nor restricted by the PALA and RSA.

But in this case, based on a close examination of the plain language of the RSA and

PALA, the court finds that nothing in the RSA and PALA limited the agreement exclusively to

bars with "pipe bowl" ends.[1]  Rather, the scope of the RSA and PALA was governed by the

assignment of the '978 patent and the '928 application to Mr. Terry, and the license of the '286

patent, '978 patent, and '928 application back to Mr. Hinds.  This is so because this exchange

created the rights that enabled both Mr. Terry and Mr. Hinds to compete in the same market, thus

requiring a delineation of products as set forth in the RSA.  As part of the agreement, there was

an exchange of "all patents that issue therefrom and all divisions, continuations, and

continuations-in-part, reexaminations, substitutions, reissues, extensions, and renewals" from the

patents and patent application.  The court concludes that this exchange contemplated all products

claimed by the '286 patent, the '978 patent, and the '461 patent – being a continuation of the

'928 application as subsequently granted by the USPTO.  (PALA ¶2.1.)

Having determined that the scope of the RSA and PALA was governed by the claims of

the '286 patent, the '978 patent, and '461 patent, the court must examine whether the claims of

---

[1] Defendants argue that the RSA was limited to "pipe bowl" bars because the RSA was confined to bars "similar to that presently shown in Exhibit C [an exhibit showing a "pipe bowl" bar.]" RSA at ¶10.  But, the court finds that the term "similar to" does not confine the RSA to only "pipe bowl" bars.  Rather, the scope of the RSA is better defined by the assignment and license agreement that created the rights that enabled Mr. Terry and Mr. Hinds to compete in the same market and necessitated the delineation of products as set forth in the RSA.

any of these patents cover the Lifeline Cable Bar.  In this case, the Defendants admit that the Lifeline Cable Bar, with its "figure 8" ends, was within the scope of the claims of the '461 patent.[2]  So, in view of the court's finding that the PALA contemplated products covered by the '461 patent and the Defendants' admission that the Lifeline Cable Bar was within the scope of the '461 patent claims, the court grants Plaintiffs' motion as to the express breach of contract claims.

### C.      Limitation on Damages on the Express Breach of Contract

Having concluded that Plaintiffs are entitled to summary judgment on their express breach of contract claims, the court must determine the appropriate damages period for the claims.  Plaintiffs argue that the since the Defendants acted in bad faith by seeking reexamination of the '461 patent, the court should disregard the fruits of that alleged bad faith.  In other words, the court should disregard the subsequent action by the USPTO to cancel all claims of the '461 patent, and should award damages to Plaintiffs without any limitation on the damages period.

In determining whether Defendants breached the express terms of the contract, the court weighed heavily the fact that the USPTO granted Mr. Terry the '461 patent as a continuation of the '928 application.  It would be inconsistent for the court to disregard the subsequent actions by the USPTO that cancelled all claims of the '461 patent.  In addition, in light of the fact that the USPTO has granted Defendants a patent for the "figure 8" design, if the court were to pretend that the '461 patent still existed in full force, it would allow Mr. Terry to preclude the Defendants from enjoying the benefits of their own patent on the "figure 8" design.

---

[2] Hearing at Time Stamp 54:18 ("Mr. E. Van Camp:  But the patent that [Plaintiffs] sued under was not the one that was assigned and became the '762 patent which covered [the bar with the "pipe bowl" ends], the one that they sued under was the extension ['461 patent] which had additional claims to cover [the bar with the "figure 8" ends].   Court:  That's right.  Mr. E. Van Camp:  And that's obviously where the problem came from.").

Accordingly, the court finds that the damages ascertainable to the express breach of contract are limited to the time when Mr. Hinds and Mr. Terry signed the RSA in May 2007 to the time that the '461 patent was cancelled in September 2012.

**III.     Breach of Covenant of Good Faith and Fair Dealing**

Plaintiffs and Defendants both seek summary determinations regarding whether Defendants breached the covenant of good faith and fair dealing by (1) intentionally breaching the express terms of the RSA; and (2) seeking to invalidate the '461 patent through reexamination.  Under Utah law, "a covenant of good faith and fair dealing inheres in most, if not all, contractual relationships."  *St. Benedict's Dev. Co. v. St. Benedict's Hospital*, 811 P.2d 194, 199 (Utah 1991).  "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract."  *Id.* at 199-200.  "A violation of the covenant gives rise to a claim for breach of contract."  *St. Benedict's Dev. Co.*, 811 P.2d at 200. The court examines each of the parties' arguments in view of Utah's law regarding the implied covenant of good faith and fair dealing.

**A.     Plaintiffs' Allegations Regarding Express Breach of the RSA**

Plaintiffs first contend that Defendants breached the covenant of good faith and fair dealing by intentionally engaging in actions to breach the express terms of the RSA.  Plaintiffs argue that this intentional action destroyed and injured Mr. Terry's rights to receive the benefits of the RSA.  Under Utah law, express breach of contract and breach of the implied covenant of good faith and fair dealing are separate causes of action.  The express breach of contract claims arise from a breach of the obligations expressly promised in the contract.  In contrast, the "purpose of the good faith doctrine in contract law is to protect the reasonable expectations of the

parties by *implying terms in the agreement*." *A.I. Transport, Div. of Ins. Co. of State of Pa v. Imperial Premium Fin., Inc.*, 862 F.Supp. 345, 347-48 (D. Utah 1994) (emphasis added). Under the doctrine of breach of the implied covenant of good faith and fair dealing, the court may imply or read terms into the agreement to protect the reasonable expectations of Mr. Terry and Mr. Hinds. Breaching these implied terms gives rise to an action for the breach of the implied covenant of good faith and fair dealing entirely separate and apart from any breach of the express terms of an agreement.

Here, Defendants conflate these two different causes of action by alleging that Defendants breached the implied covenant of good faith and fair dealing by breaching the express terms of the RSA. If the Defendants breached the express terms of the contract, that conduct might give rise to an express breach claim. But if the Defendants breached an implied good faith term in the contract, it gives rise only to a breach of the implied covenant of good faith and fair dealing.

Accordingly, the court dismisses Plaintiffs' cause of action alleging that Defendants breached the covenant of good faith and fair dealing by intentionally breaching the express terms of the RSA. These express breach claims are more appropriately analyzed under a theory of express breach of contract rather than a breach of the implied covenant of good faith and fair dealing.

**B.      Plaintiffs' Reexamination Allegations**

Plaintiffs also argue that Defendants breached the covenant of good faith and fair dealing by initiating the reexamination of the '461 patent, a continuation of a patent application assigned

by Defendants to Plaintiffs under the PALA and RSA.[3] This reexamination led to the cancellation of all the claims of the '461 patent. In Utah, compliance with the implied covenant of good faith and fair dealing "depends upon the agreed common purpose and justified expectations of the parties . . . [and] good faith and fair dealing are fact sensitive concepts, and whether there has been a breach of good faith and fair dealing is a factual issue, generally inappropriate for decision as a matter of law." *Republic Group, Inc. v. Won-Door Corp.*, 883 P.2d 285, 291 (Utah Ct. App. 1994).

Here, the court finds that there are genuine disputes of material fact concerning whether Defendants' initiation of the reexamination of the '461 patent constituted a breach of the covenant of good faith and fair dealing. For example, a reasonable jury may conclude that Mr. Terry had a justified expectation that Mr. Hinds would not seek to cancel a patent based on a patent application that Mr. Hinds assigned to him – especially since Plaintiffs allege that Mr. Hinds used prior art references to seek reexamination that should have been sent to the USPTO as part of his '928 patent application. On the other hand, a reasonable jury may conclude that Mr. Hinds was properly justified in defending himself in any way possible once he believed Mr. Terry would file suit against him, including seeking reexamination of the '461 patent.

Accordingly, the court denies both Plaintiffs' and Defendants' summary judgment motions on Plaintiffs' breach of the covenant of good faith and fair dealing claim.

## IV. Damages

### A. Reasonably Ascertainable Damages

Defendants argue that Plaintiffs' breach of contract claims should be dismissed because Plaintiffs have not demonstrated reasonably ascertainable damages resulting from the alleged

---

[3] It appears that Plaintiffs do not contend the Defendants breached the covenant of good faith and fair dealing by initiating the reexamination of the '286 patent.

breach.  But under Utah law, "it is well settled that nominal damages are recoverable upon a breach of contract if no actual or substantial damages resulted from the breach or if the amount of damages has not been proven."  *Blair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392-93 (Utah 2001).  Thus, even if Plaintiffs are unable to prove actual or substantial damages resulting from the breach, the Plaintiffs may nevertheless seek nominal damages to sustain a breach of contract claim.

Moreover, the court finds that Plaintiffs have alleged at least some reasonably ascertainable damages resulting from the breach.  Specifically, Plaintiffs allege that they "paid in excess of $150,000 in attorney fees to prosecute and maintain" the patents that Defendants wrongfully invalidated in reexamination.  (Terry Decl., Exh. K, Dkt. 86-11.)

Defendants respond that the Plaintiffs' claim for $150,000 in attorney fees and costs was incurred in subsequent litigation to resolve a dispute over the agreement, and therefore cannot provide a basis for damages in a breach of contract claim.  In Utah, "[a]s a general rule, legal damages serve the important purpose of compensating an injured party for actual injury sustained, so that she may be restored, as nearly as possible, to the position she was in prior to the injury."  *Mahmood v. Ross*, 990 P.2d 933, 937 (Utah 1999).  "Typically, there are two types of damages a non-breaching party can recover in an action for breach of contract:  general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into."  *Id.*

Here, the legal costs and attorneys' fees that the Plaintiffs seek as damages are not related to the legal costs and attorneys' fees incurred in this present litigation.  Rather, Plaintiffs seek damages based on the costs and fees incurred defending the patents during reexamination.  If

Defendants breached the implied covenant of good faith and fair dealing in the contract by seeking reexamination of the patents assigned under the PALA, a reasonable jury may properly conclude that those costs and fees are an important element to restoring Plaintiffs to the position they were in prior to the breach of the covenant – namely, Plaintiffs would still have valid patents without any expenditure to defend the reexamination. Thus, Plaintiffs' claims for attorneys' fees and costs associated with the reexamination are appropriately included as damages in this action.

Accordingly, the court denies Defendants' summary judgment motion for breach of contract based on the theory that Plaintiffs have not proved reasonably ascertainable damages.

### B.      Sufficiency of Damages

The court is mindful that Plaintiffs have asserted six categories of damages, and the Defendants have at least indirectly challenged whether Plaintiffs set forth damages with sufficiency to permit a jury to make a substantive award as to each of these categories. Indeed, under Utah law, in order to receive damages, plaintiffs "must demonstrate the amount of damages with sufficient certainty to permit the factfinder to make an award, although the damages need not be proven with precision." *Turtle Management, Inc. v. Haggis Management, Inc.*, 645 P.2d 667, 670 (Utah 1982).

But here, Defendants' summary judgment arguments explicitly focus on whether Plaintiffs have adequately asserted <u>any</u> claims for substantive and cognizable damages caused by the Defendants sufficient to overcome summary judgment. Having concluded that Plaintiffs may legally seek nominal damages if they are unable to prove actual or substantial damages, and that at least a portion of Plaintiffs' damages are reasonably ascertainable from the alleged breach, the court finds that Plaintiffs have asserted damages claims sufficient at least to survive summary judgment. Thus, the court need not determine, at this stage of the litigation, whether Plaintiffs

set forth damages with sufficiency to permit a jury to make an award as to each separate category of damages not specifically discussed in this Order. These disputes may be resolved as *motions in limine* prior to trial, or at the close of the Plaintiffs' evidence at trial.

### C. Specific Performance

Plaintiffs argue that since Defendants breached the contract, the court should order Defendants to cease and desist manufacturing, marketing, and selling the Lifeline Cable Bar. Plaintiffs further argue that the court should order Defendants to seize and destroy all Lifeline Cable Bars in Defendants' possession. But here, even though the court found that the Defendants breached the express terms of the RSA, the court limited the damages for the express breach to a time period that closed in September 2012. Accordingly, the court finds that an equitable order for specific performance is inappropriate at this time. Nevertheless, the court must determine whether, as a matter of law, specific performance is an appropriate remedy if the Plaintiffs ultimately succeed on their remaining claims.

Under Utah law, "[w]hen a party seeks an order of specific performance, the contract must clearly impose the duty sought to be enforced. . . . Indeed, for a court to order specific performance . . . [the contract] must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to terms so that the court may enforce it as actually made by the parties." *Tooele Associates Ltd. Partnership v. Tooele City*, 251 P.3d 835, 835-36 (Utah Ct. App. 2011). Thus, whether the requested cease and desist order, or the seize and destroy order, are appropriate as a matter of law depends on whether the contract imposed a clear duty on the Defendants to cease and desist, or seize and destroy, the Lifeline Cable Bar if these products were found to violate the RSA.

Here, Mr. Terry and Mr. Hinds understood that they would be manufacturing, marketing, and selling competing products that would be similar in appearance and function. To distinguish Mr. Terry's products from Mr. Hinds's products, the RSA prohibited Mr. Hinds from manufacturing, marketing, and selling certain products that could be confused with Mr. Terry's products. There is no doubt that the parties intended for Mr. Hinds to cease and desist the manufacturing, marketing, and sale of the Lifeline Cable Bar if it was found to violate the RSA. Accordingly, the court finds that if the Plaintiffs ultimately prevail on their claims, Plaintiffs' request for a cease and desist order is appropriate as a matter of law.

In contrast to the cease and desist order, the court does not find that the RSA imposed a clear duty for Defendants to seize and destroy the Lifeline Cable Bar. Rather, under the RSA, Mr. Terry agreed to purchase the lift bars in Mr. Hinds's inventory that might violate the RSA. The court is mindful of Plaintiffs' concern that without a seize and destroy order, the Defendants' product might find its way into the market. The court, however, finds that an appropriately worded cease and desist order is sufficient to satisfy Plaintiffs' concerns if Plaintiffs ultimately succeed on their claims. Accordingly, the court finds that specific performance in the form of an order to seize and destroy the Lifeline Cable Bar is improper as a matter of law.

## V.     Unfair Competition

Finally, Plaintiffs claim that Defendants have engaged in unfair competition in violation of the statutory and common law of Utah. (Dkt. 76 at ¶¶58-61.) At the hearing held on January 23, 2014, Plaintiffs admitted that they could not sustain a claim under the Utah Unfair Competition Act or Utah common law. (Hearing at Time Stamp 1:25 ("Court: Is there still some contention about the viability of the unfair competition claims. I'm unclear about that. Mr.

Veverka:  Your honor, we would concede that with the cancellation of the patents that that claim is moot.").)

Accordingly, the court grants Defendants' motion for summary judgment as to the unfair competition claims, and dismisses Plaintiffs' fourth cause of action that Defendants engaged in unfair competition under the statutory and common law of the State of Utah, including at least Utah Code Ann. §§ 13-5a-101, *et seq.* (2011).

## CONCLUSION

For the reasons stated, the court GRANTS IN PART and DENIES IN PART Plaintiffs' and Defendants' motions for summary judgment.  (Dkt. 85, 89.)  Specifically, the court makes the following rulings:

1.  The court GRANTS Plaintiffs' summary judgment motion as to the claims for the express breach of contract.

2.  The court LIMITS the damages available for the express breach of contract to the time between when Mr. Hinds and Mr. Terry entered into the RSA in May 2007 and the time that the claims of the '461 patent were cancelled in September 2012.

3.  The court DISMISSES the Plaintiffs' claim for the breach of the covenant of good faith and fair dealing by intentional breach of the express terms of the contract.

4.  The court DENIES both Plaintiffs' and Defendants' motions for summary judgment on Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing premised on theories other than that discussed in No. 3 above.

5.  The court DENIES both Plaintiffs' and Defendants' motions for summary judgment on the requested cease and desist order, but finds that, if Plaintiffs ultimately succeed on

their claims, Plaintiffs' request for a cease and desist order is appropriate as a matter of law.

6. The court GRANTS Defendants' motion for summary judgment on the requested seize and destroy order and finds that the Plaintiffs' requested seize and destroy order is improper as a matter of law.

7. To the extent the parties seek a summary determination on the appropriateness of attorneys' fees and costs related to this litigation, the court DENIES these motions as MOOT.

8. The court GRANTS Defendants' motion for summary judgment on Plaintiffs' unfair competition claims and DISMISSES those claims.


SO ORDERED this 17th day of September, 2014.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge